UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>United States of America</u>

         v.                          Criminal No. 04-cr-192-01-JD
                                     Opinion No. 2006 DNH 008
<u>Bruce Belton</u>


O R D E R


     Bruce Belton has moved to suppress evidence allegedly seized
from his home during the execution of a search warrant on the
independent grounds that (1) the warrant application failed to
demonstrate probable cause and (2) the application intentionally
or recklessly omitted facts, which, if included, would have
undermined the determination that probable cause existed.  <u>See</u>
<u>Franks v. Delaware</u>, 438 U.S. 154 (1978).  The government objects,
arguing that probable cause supported the warrant but, even if it
did not, suppression is inappropriate by virtue of the good-faith
exception.  <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897 (1984).  The
government also maintains that no <u>Franks</u> violation occurred.
Over the government's objection, the court held an evidentiary
hearing on the <u>Franks</u> aspect of the motion on January 4, 2006.


<u>Background</u>

     The following facts are drawn from the affidavit submitted
by New Hampshire State Trooper James J. Geraghty in support of

the search warrant ("Geraghty Aff."), except as otherwise noted.[1]
Geraghty has worked as a detective in the state's Narcotics
Investigation Unit since September, 1997, and spent eighteen
months as a federal narcotics task force officer beginning in
January 2000.  During that time, Geraghty has worked drug cases
exclusively, including major multi-state narcotics conspiracies,
and has also served in an undercover capacity.

Geraghty assisted the Vermont Drug Task Force with its
investigation of one Dennis W. Schofield, a member of the
Freelancers motorcycle club who was suspected of distributing
methamphetamine obtained from a source in New Hampshire.  Trooper
Kevin Lane served as the case agent on the investigation for the
Vermont State Police.  On September 18, 2003, police followed
Schofield to the Harley Davidson retail outlet in Tilton, New
Hampshire, where they observed him meeting with a man wearing
Freelancers "colors" who was later identified as Belton.  The
authorities believed that Schofield had made the trip for the
purpose of obtaining methamphetamine, also known as "meth" or
"speed."  The affidavit does not describe what, if anything, the
police saw Belton and Schofield do during the meeting.  The

---

[1]The balance of the facts are drawn from Geraghty's
testimony at the <u>Franks</u> hearing, the affidavit he swore out in
support of the government's objection to the hearing ("Second
Geraghty Aff."), and the police reports appended to that
affidavit and received into evidence at the hearing.

police trailed Belton as he left the Tilton outlets in his van,
following him to the Northeast Vietnam Veterans Motorcycle
Clubhouse, a supermarket, and finally his residence, all located
in Franklin, New Hampshire.  Belton lives there at 3 Lilac Lane.

Four days after this meeting, on September 22, 2003,
Schofield sold four grams of meth to an undercover agent of the
Vermont Drug Task Force and "discussed his past and current deals
. . . ."  Mem. Opp'n <u>Franks</u> Hrg. at 3.  During this discussion,
Schofield said that he "used to get his meth at a much cheaper
rate," but that his source of supply "at the time was from NH and
they had recently [been] arrested."  <u>Id.</u>  According to Schofield,
"2 guys were arrested for 5 pounds of meth and they cooperated
and got another 5 pounds from their source of supply in Arizona."
<u>Id.</u>  Schofield added that "this new [source of supply] is not as
good and it is more expensive . . . ."  <u>Id.</u>  None of this
information about the events of September 23 was included in the
warrant application.

On October 13, 2003, the undercover agent gave Schofield
$1,000 to buy methamphetamine.  The police followed Schofield as
he traveled from Vermont to Franklin, but "[s]urveillance was
terminated approximately one (1) mile from BELTON's residence
. . . due to the fact that [he] lives in a small trailer and
vehicles would be easily detected in the immediate area."
Geraghty Aff. ¶ 4.  The next day, Schofield presented the

undercover officer with 5.5 grams of meth.

A report prepared by the undercover officer about this transaction reveals that he ultimately had to track Schofield down at his home around 3 p.m. on October 14 to retrieve the drugs, despite Schofield's representation that he would call the officer for that purpose while driving back from New Hampshire early that morning.  These details were not included in the warrant application.

After taking an hiatus from his drug distribution activities because he suspected that he was being investigated, Schofield went back to selling meth.[2]  On February 2, 2004, the undercover Vermont narcotics officer met with Schofield again to set up another methamphetamine buy.  During the meeting, Schofield explained that he had yet to get in touch with his source of supply and used the agent's cell phone to attempt to contact the source.  This attempt was unsuccessful--Schofield did not end up talking to anyone during the call--though the warrant application omits this detail.  The application also fails to mention that, during his meeting with the undercover officer, Schofield said that he would be heading to New Hampshire to help a friend move

_____

[2]The affidavit states simply that "[b]etween October 2003 and February 2003" the undercover agent learned that Schofield had stopped dealing drugs but that he resumed doing so "[a]fter a safe period of time had elapsed . . . ."  The affidavit does not offer any more specific information on the temporal parameters of Schofield's break from distributing narcotics.

and that he would contact the officer when the source called.

The police later determined that the number Schofield had dialed belonged to a business, All Things Imprinted, run by Belton and located at the same address as his residence.  The warrant application states that the authorities observed Schofield driving back toward Vermont "from the area of Franklin[,] New Hampshire" that night.  In fact, though this detail was omitted from the warrant application, Schofield was five to ten miles away from Belton's residence at that point.

The warrant application also omits other details of the undercover officer's February 2 interaction with Schofield.  In particular, the officer gave Schofield $1,000 to purchase methamphetamine when the two met at a private residence in Lebanon, where Schofield was helping the aforementioned friend move.  Schofield said "he would be leaving that night and would contact [the officer] upon his return."  He failed to do so, however, and the officer was not able to get in touch with Schofield until February 5, 2004.  At that point, Schofield explained his failure to provide the methamphetamine as the result of having encountered a police roadblock on his way back to Vermont, which caused him to throw the drugs out of his car window.  Schofield also said that police had used a dog to examine his car.  After the police could not independently verify this tale, they decided to arrest Schofield, who ultimately

provided neither the methamphetamine nor the $1,000.

As the warrant application notes, the Vermont State Police took Schofield into custody on February 6, 2004.  He was arraigned in the United States District Court for the District of Vermont three days later and subsequently released after he agreed to cooperate with the investigation of Belton.

While in custody, Schofield identified Belton as the source of his methamphetamine supply and reported that Belton "also sells cocaine."  Geraghty Aff. ¶ 7.  Schofield said that he had been buying speed from Belton since the summer of 2003, in quantities as large as a half-ounce of crystal methamphetamine for $1,900, but that Belton also sells crystal meth for $3,600 an ounce and $600 for an "eight ball," or eighth-ounce.  Schofield explained that Belton is a founding member and former vice president of the Freelancers who "sells to patch wearing members" of that organization and the Vietnam Veterans Motorcycle Club. Id.  According to Schofield, Belton "sells from his residence as well as the clubhouse" and "gets his methamphetamine from a place identified as 'The Store,'" known to Schofield only as such.  Id. Although Schofield also recounted having seen an ounce of crystal meth at Belton's residence, the affidavit does not say whether Schofield related when, or how many times, that happened.  A check of Schofield's phone revealed that he had received a call from Belton's number on January 31, 2004.

6

Following his apprehension, Schofield was willing to assist the authorities by making "controlled purchases" of methamphetamine from Belton, but believed that he would have to wait some time before attempting one because Schofield's recent arrest would likely make Belton suspicious of such a ruse.  The Vermont State Police therefore "decided to delay any 'active cooperation' on Schofield's part."  Second Geraghty Aff. ¶ 7.  Although Geraghty was aware of these developments as they occurred, he did not mention them in the warrant application.

Through other New Hampshire State Police officers, Geraghty eventually confirmed Belton's association with the Freelancers.  On June 21, 2004, the New Hampshire State Police received a call on its 1-800-NAB-DOPE hotline from an anonymous source, who reported that "Bruce Pelton," a motorcycle club president from Franklin, was selling speed.  Geraghty believed that the tip confirmed what Schofield had told the police about Belton.  In line with Geraghty's "aware[ness] that many honest people with legitimate information wish to remain anonymous for fear of reprisals," the caller explained that he would be in danger if he gave his name.  Geraghty Aff. ¶ 14.  According to Geraghty, motorcycle gangs dominate the methamphetamine trade and often intimidate those who might report their activities to law enforcement.  In fact, the Freelancers had dispatched one of their members to attend the court proceedings on Schofield's case

7

and to obtain any papers filed in it, which were brought to the
Freelancers' clubhouse the day after Schofield's arraignment on
February 9, 2004.

On June 24, 2004, Geraghty called the Vermont Drug Task
Force and learned that Schofield "ha[d] failed to actively
cooperate with the investigation" of Belton and that Schofield
"ha[d] subsequently been indicted and is currently awaiting
trial."  Geraghty Aff. ¶ 16.  While Geraghty's affidavit in
support of the warrant does not indicate when these events
occurred, court records show that Schofield was indicted in the
District of Vermont for a second time on April 15, 2004.  The
affidavit also does not mention Lane's statement to Geraghty that
Belton "would not be indicted in Vermont unless [Schofield] came
forward with his attorney and gave an in-depth proffer."  Franks
Hrg. Ex. A, at 14.  When Geraghty applied for the warrant on June
30, 2004, he did state that the investigation of Belton "may be
compromised by the fact that SCHOFIELD is no longer cooperating
. . . .  Any evidence that is at BELTON'S residence may be
removed or destroyed if SCHOFIELD alerts BELTON to this
investigation."  Geraghty Aff. ¶ 17.

In his affidavit in support of the warrant, Geraghty
explained at length how his training and experience had taught
him that narcotics dealers often keep cash, weapons, drug
paraphernalia, and other evidence of their activities in their

homes.  Geraghty Aff. ¶¶ 20-34.  He added that the evidence
commonly includes records of drug transactions maintained long
after those transactions take place.  Id. ¶¶ 20, 24, 29.
Geraghty gave his "opinion that a search warrant is a vital tool
necessary to obtain evidence, which is necessary for a successful
prosecution of BRUCE BELTON.  There are currently no undercover
officers or cooperating individuals that can make purchases of
controlled drugs from BRUCE BELTON."  Id. ¶ 18.  The affidavit
also noted that vehicles registered to Belton were observed at
the subject address as recently as June 28, 2004.

Based on the information contained in Geraghty's affidavit,
a justice of the Concord District Court issued a warrant on June
30, 2004, authorizing a search of Belton's residence at 3 Lilac
Lane in Franklin for evidence of drug trafficking.[3]  The search,
performed late that morning, turned up substantial quantities of
methamphetamine and cocaine, as well as a triple-beam balance,
three handguns, and $40,479 in cash.  A grand jury subsequently
indicted Belton on charges of possessing and conspiring to
distribute methamphetamine and possessing firearms in furtherance
of drug trafficking and in spite of his status as a felon.

<u>Discussion</u>

---

[3]For the sake of consistency with the traditions of Fourth
Amendment jurisprudence, the court will refer to the Concord
District Court judge as "the magistrate."

The Fourth Amendment provides that "no [w]arrants shall issue, but upon probable cause . . . ."  Pursuant to the exclusionary rule, "[t]he usual remedy for seizures made without probable cause is to exclude the evidence wrongfully seized . . . ."  United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001) (citing Weeks v. United States, 232 U.S. 383, 391–93 (1914)).  Nevertheless, because "[t]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates," Leon, 468 U.S. at 916, in most cases where "an officer acting with objective good faith has obtained a warrant from a judge or a magistrate and acted within its scope . . . . there is no police illegality and thus nothing to deter" by suppressing the evidence, even if the warrant issued without probable cause.  Id. at 920.  In such a case, then, the exclusionary rule does not apply.  Id. at 922.

While maintaining that probable cause existed to support the issuance of the warrant, the government argues in the alternative that, even if probable cause was lacking, the police acted in good faith in securing and executing the warrant and that the evidence allegedly found should not be suppressed.  As the government notes, "Leon allows the trial court, in its 'informed discretion,' to bypass the customary 'merits' inquiry into whether there existed a 'substantial basis' for the probable cause determination made by the issuing magistrate, and simply

10

decide whether the challenged search in all events came within the 'good faith' exception to the exclusionary rule." United States v. Zayas-Diaz, 95 F.3d 105, 112 (1st Cir. 1996) (quoting Leon, 468 U.S. at 925).  The court agrees that such an approach is warranted here, given the absence of any of the countervailing "prudential considerations" identified by Leon.  Id. at 112 n.8. The government bears the burden of showing that the good faith exception applies.  United States v. Diehl, 276 F.3d 32, 42 (1st Cir. 2002) (citing Brunette, 256 F.3d at 19).

"[W]hile Leon restricts the application of the exclusionary rule, it does not eliminate it."  United States v. Capozzi, 347 F.3d 327, 332 (1st Cir. 2003).  Exclusion remains appropriate in certain circumstances, including where facts material to the decision to issue the warrant were intentionally or recklessly omitted from the affidavit submitted in support of it, or where "the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id.; see also Leon, 468 U.S. at 923; United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001).  Belton argues that both of these scenarios are present here.  The court will address his contentions in turn.

I.    Whether Material Facts Were Intentionally or
      Recklessly Omitted from the Warrant Application

In Franks, the Supreme Court recognized a defendant's right
to challenge "the veracity of a sworn statement used by police to
procure a search warrant."  438 U.S. at 155.  To receive a
hearing for this purpose, a defendant must make "a substantial
preliminary showing that a false statement knowingly and
intentionally, or with reckless disregard for the truth, was
included by the affiant in the warrant affidavit, and [that] the
allegedly false statement is necessary to the finding of probable
cause . . . ."  Id. at 155–56.

The omission of a material fact from the affidavit
supporting a warrant is treated as a false statement for purposes
of the Franks analysis.  United States v. Castillo, 287 F.3d 21,
25 (1st Cir. 2002); United States v. Charles, 213 F.3d 10, 23
(1st Cir. 2000).  In the case of an omission, "suppression should
be ordered only if the warrant application, . . . clarified by
disclosure of previously withheld material, no longer
demonstrates probable cause."  United States v. Stewart, 337 F.3d
103, 105 (1st Cir. 2003); Castillo, 287 F.3d at 25 n.4 ("With an
omission, the inquiry is whether its inclusion in an affidavit
would have led to a negative finding by the magistrate on
probable cause.").  This court previously ruled that Belton's
written submissions succeeded in making the "substantial
preliminary showing" necessary to entitle him to a Franks

12

hearing.  438 U.S. at 155–56.  As the court stated at the
hearing, however, this was simply a preliminary determination:
"[w]hether [a defendant] will prevail at [the <u>Franks</u> hearing] is,
of course, a different matter" from whether he is entitled to
one."  <u>Id.</u> at 172.

Belton has identified several categories of information
which, he argues, would have led the magistrate to refuse to find
probable cause had they been included in the warrant application.
The first of these consists of Schofield's statement on September
22, 2003, that he "used to get his meth at a much cheaper rate,"
but that his source of supply "at the time was from NH and they
had recently [been] arrested" and that his "new [source of
supply] is not as good."  Belton does not dispute that Schofield
could have been referring to him as the "new" source.  Instead,
he argues that the "recent" arrest of the former source could
have occurred <u>after</u> Schofield's trip to New Hampshire to purchase
methamphetamine on September 18 and that this bit of information
tends to cast his meeting with Belton on that date in a more
innocent light, <u>i.e.</u>, Schofield could have gone to buy meth from
the old source either before or after he met with Belton for
another, legal purpose.

In the court's view, this is a strained interpretation of
Schofield's statement.  Belton's reading would have Schofield's
old source meet with him on September 18, then get arrested,

13

agree to cooperate with the authorities, and obtain methamphetamine from Arizona, all in enough time for Schofield to have learned about it by September 22.  The considerably more likely scenario is that the former supplier was arrested some time before Schofield's September 18 trip to New Hampshire--a fact which, as Belton acknowledges, "is neutral and would not necessarily provide the reviewer of the affidavit with relevant or necessary information; it's [*sic*] omission would not be material."  Mem. Supp. <u>Franks</u> Hrg. at [6].  Indeed, although Belton asked for a <u>Franks</u> hearing in part to ascertain the correct interpretation of Schofield's September 22 statement, <u>see id.,</u> he failed to adduce any evidence to that effect at the hearing itself.  Accordingly, the court determines that the September 22 statement was not relevant to the magistrate's probable cause determination.

Belton also argues that the application's description of the events of October 13 and 14, 2004--when the undercover officer provided Schofield with $1,000, and Schofield later provided the officer with a quantity of methamphetamine--creates the impression that the authorities "had no problem pinning down exactly when the drugs were purchased.  The reality is something quite different."  Mem. Supp. <u>Franks</u> Hrg. at [6-7].  In reality, although Schofield had said he would contact the undercover officer on his way back from his trip to New Hampshire to obtain

14

the meth in the early morning hours of October 14, he failed to
do so, causing the officer to spend much of that day trying to
track him down to pick up the drugs.  Belton argues that this
omitted information suggests that Schofield had ample opportunity
to obtain the methamphetamine from another source, rather than
during the trip to Belton's hometown of Franklin which is
described in the warrant application.[4]

The problem with this argument is that Geraghty's affidavit
candidly states that the undercover agent gave Schofield the cash
on October 13 and that Schofield gave the agent the meth on
October 14.  Geraghty Aff. ¶ 4.  As a result, the magistrate
would have been aware of the passage of time between the delivery
of the money and the delivery of the drugs and taken this fact
into consideration in deciding whether the events of October 13
and 14 implicated Belton in Schofield's illicit conduct.  While
Geraghty's affidavit did not include everything the police knew
about Schofield's actions on October 14, none of those actions
(going to deliver wood, working on a tractor in his yard) readily
suggests an opportunity to obtain the methamphetamine from

---

[4]Belton also points out that, while the affidavit states
that the authorities terminated their surveillance of Schofield
at a point approximately one mile from Belton's residence,
Geraghty testified that the distance might have actually been
between five and ten minutes from Belton's residence.  The court
attaches no significance to this discrepancy, if in fact it can
properly be characterized as such.  See Capozzi, 347 F.3d at 333
(noting that such "technical criticism of the form of [a warrant]
affidavit is insufficient to undermine its veracity").

another source.[5]  Those details were therefore immaterial to the

magistrate's probable cause determination.  See United States v.

Higgins, 995 F.2d 1, 4 (1st Cir. 1993) (finding fact that

informant unsuccessfully tried to buy drugs from defendant

immaterial to probable cause to search defendant's home because

"not necessarily inconsistent" with information that defendant

later purchased quantity of drugs).

Belton also characterizes these details, as well as the rest

of the omitted facts underlying his challenge to the warrant

application, as tending to undermine Schofield's veracity.  In

addition to Schofield's failure to call the undercover officer on

the way back from New Hampshire on October 14 as he had promised,

Belton points to the events of February 2, 2004, when the

undercover officer again gave Schofield $1,000 to buy

methamphetamine but he ultimately failed either to deliver the

drugs or to return the cash.  As on October 13, when Schofield

accepted the buy money on February 2, he indicated that he would

call the undercover officer upon returning from New Hampshire,

_____

[5]Schofield called the undercover officer at 9:30 a.m. on
October 14 and arranged for him to pick up the methamphetamine at
Schofield's residence at noon.  When the officer arrived there at
1:30 p.m., Schofield's girlfriend said that he was not home, but
that he had the meth with him; she also gave the officer
directions to Schofield's location.  When the details of what the
police knew of Schofield's actions on October 14 but omitted from
the warrant application are considered in their entirety, then,
it becomes clearer than they do not seriously call the probable
cause determination into question.

but did not do so.  In fact, the undercover officer had no
contact with Schofield until the officer called him on February
5, 2004.  Confronted during this call with his failure to provide
the drugs, Schofield fabricated a story about a police roadblock
that caused him to discard them--an apparent effort to cover up
the fact that he had simply misappropriated the money.

   Belton argues that these facts show that "Schofield is not
and was not a credible informant.  He lied and deceived . . . ."
Mem. Supp. <u>Franks</u> Hrg. at [10].  Given that Schofield was the
only identifiable source of first-hand information about Belton's
allegedly illegal activities, he argues that the inclusion of
these facts in the warrant application would have therefore led
the magistrate to find probable cause lacking.  Although the
court shares Belton's view of the importance of Schofield's
information to the probable cause ruling, it disagrees with
Belton's ultimate conclusion in this regard.

   As already discussed, Geraghty's affidavit clearly portrays
Schofield as a drug dealer, describing both a consummated and a
proposed sale of $1,000 in methamphetamine that he made
unwittingly to an undercover police officer.  Geraghty testified
at the <u>Franks</u> hearing that, based on his experience as a
narcotics investigator, the details of Schofield's behavior which
were omitted from the warrant application simply fit this
profile.  Indeed, Geraghty explained that drug dealers often
attempt to "rip off" customers who are believed to have no

17

recourse against them, as Schofield apparently attempted to do in
accepting the undercover agent's money but failing either to
provide the desired methamphetamine or to return the payment.  It
is likewise unsurprising that, unlike a responsible businessman,
a drug dealer would neglect a promise to call one of his
customers at an appointed time as Schofield did to the undercover
agent on two occasions.

     The omitted facts, then, would not have measurably
contributed to the portrait of Schofield as a drug dealer--and,
consequently, a potentially untrustworthy informant--which
emerges from the warrant application.  In that regard, this case
is similar to <u>United States v. Rumney</u>, 867 F.2d 714 (1st Cir.
1989), where an informant falsely denied participating in a
robbery during two separate police interviews but, after his
arrest, admitted to driving the defendant to the crime scene.
<u>Id.</u> at 716.  The police later obtained a warrant to search the
defendant's home based largely on an account of the informant's
statements which omitted any reference to his initial denials of
involvement or his criminal record.  <u>Id.</u>  The circuit concluded
that these omissions would not have affected the magistrate's
ruling that probable cause existed, reasoning that the
informant's "credibility was not undercut merely because he made
predictable denials until the police could produce evidence
linking him to the robbery" or by his criminal record, which
"explain[ed] in part why [the defendant] asked [the informant] to

participate in the robbery" in the first place.  Id. at 720.

Like the warrant application in Rumney, Geraghty's affidavit makes no secret of Schofield's criminality.  Thus, despite the omission of certain details of that criminality, the magistrate "issuing the search warrant[] would manifestly have been aware . . . that [Schofield] was not a model citizen" in considering his reliability as an informant.  United States v. Hall, 171 F.3d 1133, 1142 (8th Cir. 1999) (finding omission of informant's full criminal history and use of aliases from warrant application immaterial to probable cause determination where application mentioned her participation in prostitution and auto theft) (internal quotation marks omitted); see also United States v. Avery, 295 F.3d 1158, 1168 (10th Cir. 2002) (similar).

The First Circuit's decision in United States v. Vigeant, 176 F.3d 565 (1st Cir. 1999), on which Belton heavily relies, is not to the contrary.  There, among six other omissions identified by the circuit, the warrant application "neglected to mention the [informant's] long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability." Id. at 573-74 (footnote omitted).  In concluding that these omissions were material, the circuit reasoned that they had deprived the magistrate of the opportunity to assess the "totality of the circumstances" underlying the probable cause determination.  Id. at 573 n.9 (internal quotation marks omitted).  The same cannot be said of Geraghty's affidavit in

this case, which, again, amply conveys that Schofield was
distributing methamphetamine.  The court therefore concludes that
the details of the undercover agent's attempted February 2 drug
buy and Schofield's failure to call the agent on October 14 as
promised were not material to the probable cause finding.

Belton also argues that the relevant police reports, but not
the warrant application, show that Schofield "recanted or at a
minimum altered his position of cooperation."  Mem. Supp. Franks
Hrg. at [10].  As an initial matter, none of the evidence
received in connection with the Franks hearing suggests that
Schofield retracted any part of his February 6, 2004, statement
inculpating Belton.  Instead, while Schofield had agreed at that
time to try to make controlled purchases of drugs from Belton, he
ultimately "failed to actively cooperate with the investigation,"
Geraghty Aff. ¶ 15, leading to his indictment on April 15, 2004.

Although Geraghty's affidavit did not mention Schofield's
initial willingness to attempt to make a controlled buy, its
reference to the fact that Schofield failed to cooperate and was
indicted as a result fairly indicates that he had, at some prior
point, agreed to provide cooperation.  The court therefore
disagrees with Belton that the warrant application "omitted" the
fact that Schofield "altered his position of cooperation."[6]  In

_____

[6]Similarly, even if Lane's statement to Geraghty that Belton
would not be indicted in Vermont unless Schofield gave an in-
depth proffer could be understood to mean that Schofield had
refused to do so, such a refusal would not be inconsistent with

any event, such an omission would not be material to the probable

cause finding, for the same reason that the omissions of the

details of Schofield's October 14 and February 2 transactions

with the undercover agent are not:  that an admitted criminal

would agree to cooperate with the authorities while in custody

but fail to make good on that agreement following his release

does not further diminish his reliability to any measurable

degree.[7]  See Rumney, 867 F.2d at 720.

Finally, even if the facts omitted from the warrant

application were material, either individually or in the

aggregate, that determination alone does not suffice to show that

a Franks violation occurred.  "Franks protects against omissions

that are designed to mislead, or that are made in reckless

disregard of whether they would mislead, the magistrate."  United

States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (citing

United States v. Reivich, 793 F.2d 957, 961 (8th Cir. 1986)); see

also Indelicato v. United States, 106 F. Supp. 2d 151, 160-61 (D.

Mass. 2000); United States v. Salemme, 978 F. Supp. 343, 349 (D.

Mass. 1997); 2 Wayne R. LaFave, Search and Seizure: A Treatise on

the Fourth Amendment § 4.4(b), at 545-46 (4th ed. 2004).  The

---

Schofield's initial amenability to attempt controlled purchases
from Belton.

[7]Indeed, Schofield might have simply gotten cold feet, given
that a member of the Freelancers attended his arraignment on
February 9, 2004, and that the club subsequently held meetings to
discuss the future of Schofield's membership.

evidence adduced in connection with the <u>Franks</u> hearing does not support the conclusion that Geraghty acted with this requisite degree of animus in omitting any of the facts in question from the warrant application.

Geraghty convincingly testified at the hearing that, while he recognized the importance of Schofield's credibility to the probable cause determination, he left the information as to the attempt to rip off the undercover agent and the like out of the affidavit because he considered it unremarkable based on his experience investigating drug crimes.[8]  As Geraghty put it, "it didn't seem important enough to say, 'Hey, this guy is a drug dealer and a liar'--I think the two go hand-in-hand."  The case law on this subject discussed <u>supra</u> makes clear that, far from being reckless, this was a reasonable belief on Geraghty's part.

At the <u>Franks</u> hearing, Belton made much of the fact that Geraghty did not ask Lane for a copy of his investigative file before seeking the warrant and therefore left open the possibility that any exculpatory facts about Belton potentially noted in the reports would not make it into the warrant application.  Though the better course might have been to obtain

_____

[8]Geraghty explained that he would have included these facts in the affidavit if Schofield had behaved in that fashion while <u>knowingly</u> cooperating with the authorities, because they would have suggested a troubling disregard for necessary investigative protocol.  Because Schofield was helping the police unwittingly, however, he was simply treating the undercover agent with the level of disregard common in dealer-user relationships, according to Geraghty.

the reports beforehand, Geraghty testified that he did send
multiple drafts of his affidavit to Lane before submitting it.
In any event, <u>Franks</u> does not provide for suppression "in
instances where police have been merely negligent in checking or
recording the facts relevant to a probable-cause determination."
438 U.S. at 170.   The court therefore concludes that Geraghty
did not intentionally or recklessly omit any material facts from
the warrant application within the meaning of <u>Franks</u>, which in
turn provides no obstacle to the government's reliance on the
good faith exception here.   <u>Cf.</u> <u>Vigeant</u>, 176 F.3d at 573-74
(refusing to apply good faith exception where affiant's "numerous
omissions of material facts were at least reckless" and
government "offer[ed] no rational explanation" for them).


II.   <u>Whether the Affidavit Is So Lacking in Indicia
      of Probable Cause as to Render Official Belief
      in Its Existence Entirely Unreasonable</u>

     Belton also contends that the government cannot rely on the
good faith exception because Geraghty's affidavit is "so lacking
in indicia of probable cause as to render official belief in its
existence entirely unreasonable."   <u>Leon</u>, 468 U.S. at 923
(internal quotation marks omitted).   Specifically, Belton argues
that (1) the affidavit fails to establish Schofield's reliability
as an informant and (2) in any event, neither Schofield's
statement nor the other facts set forth in the affidavit show the
requisite nexus between any illegal activity and Belton's home.

The court will consider these arguments in turn, keeping in mind that "the relevant question [is] 'whether a reasonably well-trained officer in [Geraghty's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'"  Vigeant, 176 F.3d at 572 (quoting Malley v. Briggs, 475 U.S. 335, 345 (1986)).

A.   Schofield's Credibility

The First Circuit has assembled a non-exhaustive list of factors to consider in evaluating probable cause where facts supporting the issuance of a warrant originate with an informant, including his or her apparent veracity or basis of knowledge, whether his or her statements are self-authenticating, the extent to which the statements were corroborated where reasonable and practicable, and any professional assessment of the probable significance of the statements made by the investigating authorities.  Zayas-Diaz, 95 F.3d at 111; see also, e.g., Capozzi, 347 F.3d at 333; United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002).  "'None of these factors is indispensable;' the ultimate issue is whether the totality of the circumstances establishes the credibility of the informant's story."  Capozzi, 347 F.3d at 333 (quoting Zayas-Diaz, 95 F.3d at 111).

Belton argues that the circumstances here fail to show that the information provided by Schofield was, in fact, credible, particularly because (1) Schofield was an "unproven"

informant, (2) the "scant details" he provided cannot be
considered self-authenticating, and (3) his account was not
corroborated by independent police investigation in any
significant respect.  Taking Belton's points in order, the court
notes that "an informant's tip can establish probable cause even
though the affidavit does not contain information about the
informant's past reliability" where it conveys other facts
tending to establish his or her credibility.  United States v.
Greenburg, 410 F.3d 63, 67 (1st Cir. 2005).

     In Greenburg, for example, though "the informant had no
track record of reliability," the circuit treated the facts that
the informant had met with the investigator face-to-face and that
the investigator therefore knew the informant's identity as
significant in bolstering his credibility.  Id.  The circuit
reasoned that such a meeting provided "the opportunity to
question the informant personally about the tip and take measure
of [his] credibility" as well as to "hold [him] responsible if he
provided false information."  Id.  This reasoning is similarly
applicable here, where Schofield gave his account of Belton's
allegedly illegal activities directly to Lane.

     Belton also criticizes the level of detail about his
allegedly illegal activities which Schofield provided,
characterizing his account as a "general claim[] that [Belton]
sells drugs."  Mem. Supp. Mot. Suppress at [7].  As the

government points out, however, Schofield provided information as
to the types of drugs Belton sold, at what prices, where he sold
them from, and to whom.  Schofield's statement therefore
transcended "simply identifying [Belton] as a drug dealer."
United States v. Benedict, 389 F. Supp. 2d 136, 140 (D.N.H. 2005)
(DiClerico, J.) (rejecting similar challenge to credibility of
informant whose story supported warrantless arrest).

Moreover, like the principal informant in Benedict,
Schofield claimed to have come by his information about Belton's
illegal activities through first-hand participation in them.  389
F. Supp. 2d at 141 ("'The credibility of an informant is enhanced
to the extent he has provided information that indicates first-
hand knowledge,' particularly of 'concealed illegal activity as
opposed to easily knowable, nonincriminating facts'") (quoting
Barnard, 299 F.3d at 94).  Also like his counterpart in Benedict,
Schofield implicated himself in criminal conduct beyond what the
authorities already knew, which "tend[s] to support [his]
credibility, given the disincentive to falsely incriminate
oneself."  Id.

Furthermore, contrary to Belton's third criticism of
Schofield's reliability, the authorities had independent
information corroborating a number of aspects of his story.
First, the police knew that Schofield had a relationship of some
kind with Belton because they had observed the men meeting in

26

Tilton on one occasion, and knew from the undercover agent's cell phone and Schofield's own "caller ID" that he had placed and received calls from a phone number listed to Belton's business. Second, the authorities trailed Schofield to within just a short distance from Belton's residence after the undercover agent had given Schofield money to purchase methamphetamine on October 13, 2003, and spotted Schofield near Belton's hometown on February 2, 2004, after Schofield had placed a call to Belton's number in an apparent attempt to procure more meth.

It is true, as Belton points out, that the police never witnessed any inherently suspicious behavior on his part, or even confirmed that Schofield actually came into contact with Belton during either of the trips to New Hampshire which followed his meetings with the undercover agent.  "But even '[c]orroboration of innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip.'"  Benedict, 389 F. Supp. 2d at 142 (quoting Greenburg, 410 F.3d at 69).  The activity which the police did observe dovetailed with what Schofield told them about his drug source both before and after his arrest and therefore helped to corroborate his statement inculpating Belton.  "It is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing a

substantial basis for crediting the [informant's] hearsay."
Illinois v. Gates, 462 U.S. 213, 244–45 (1983) (internal
quotation marks and bracketing omitted).

In sum, while each of Belton's criticisms of the affidavit's
indicia of Schofield's credibility has some validity, the
affidavit sets forth other aspects of Schofield's account which
tend to bolster his veracity.  In any event, the deficiencies
Belton identifies do not cast Schofield's information into
sufficient doubt so as to render Geraghty's belief in the
existence of probable cause entirely unreasonable.  "[An] officer
need not . . . entirely eliminate the risk that an informant is
lying or in error."[9]  Capozzi, 347 F.3d at 333 (internal
quotation marks omitted).  Any shortcoming in this regard, then,
is not glaring enough to prevent the government from relying on
the good faith exception.

---

[9]Indeed, "the authorities need corroborate tips only insofar
as it is "reasonable and practicable" to do so."  Benedict, 389
F. Supp. 2d 142 (quoting Greenburg, 410 F.3d at 69 n.3) (further
internal quotation marks omitted).  As the warrant application
explained, the police did not believe they could surveil Belton's
residence without detection, due to the character of his
neighborhood, and had no way to attempt a controlled buy from
Belton once Schofield refused to cooperate.

B.   <u>Nexus to Belton's Residence</u>

Belton also contends that the information set forth in the warrant application fail to demonstrate probable cause that evidence of drug-related crimes would be found at his residence. "For evidence to avert suppression, normally the warrant application must demonstrate probable cause to believe that a particular person has committed a crime--the commission element--*and* that enumerated evidence relevant to the probable criminality likely is located at the place to be searched--the nexus element."  <u>Zayas-Diaz</u>, 95 F.3d at 110-11 (internal quotation marks and citation omitted); <u>see also</u> <u>Vigeant</u>, 176 F.3d at 569. Belton argues that, in his case, "the nexus element is virtually non-existent," since the only information in the affidavit linking his home to any illegal activity was Schofield's "vague" statements that Belton "sold drugs from his residence" and that "he saw drugs" there.  Mem. Supp. Mot. Suppress at [3] & n.2.

The court notes at the outset that this argument rests on a narrow interpretation of Schofield's statement as set forth in the warrant application.  "In determining whether the nexus element is satisfied, a magistrate has to make 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  <u>United States v. Ribeiro</u>, 397 F.3d 43,

48–49 (1st Cir. 2005) (quoting <u>Gates</u>, 462 U.S. at 238).  The
magistrate may draw reasonable inferences from the facts alleged
in the warrant application in making this assessment.  <u>See</u> <u>United
States v. Falon</u>, 959 F.2d 1143, 1147 (1st Cir. 1992); <u>United
States v. Hershenow</u>, 680 F.2d 847, 851 (1st Cir. 1982).

The warrant application relates Schofield's statements that
he had been buying methamphetamine from Belton for several
months; that Belton "sells from his residence as well as the
clubhouse;"[10] and that "SCHOFIELD has seen an ounce of
methamphetamine at BELTON's residence."  Geraghty Aff. ¶ 7.
While other inferences are possible, <u>e.g.</u>, that Schofield had
only seen meth at Belton's residence on one unspecified occasion,
it is reasonable to infer from these facts that Schofield
regularly bought methamphetamine from Belton at his residence.
The information independently gathered by the authorities
supports this inference:  when Schofield attempted to purchase
methamphetamine for the undercover officer, he either traveled
into the vicinity of Belton's residence or called a phone number
listed for that address.[11]

_____

[10]It is unclear from the affidavit whether the "clubhouse"
in question belongs to the Freelancers or the Vietnam Vets
Motorcycle Club.

[11]Belton emphasizes that the phone number, registered to his
business, was listed to a different street address in Franklin as
well as to his home.  A warrant application, however, need

"The probable-cause nexus between enumerated evidence of the crime and the place 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment, and normal inferences as to where a criminal would hide evidence of a crime.'" Ribeiro, 397 F.3d at 49 (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)) (bracketing omitted).  Here, these considerations justify the inference that Belton kept evidence of his drug dealing at his residence.  Indeed, Geraghty stated in his affidavit that, based on his training and experience, narcotics dealers often keep cash, weapons, drug paraphernalia, records of drug transactions, and other evidence of their activities in their homes.  While "[a]lone, such generalized observations may not be enough to satisfy the nexus element," id. at 50 (citing cases), they do not stand alone in this instance, but are accompanied by the statement of an informant with first-hand knowledge of the connection, corroborated in material respects.  See Zayas-Diaz, 95 F.3d at 112; cf. State v. Silvestri, 136 N.H. 522, 528 (1992) (reversing denial of motion to suppress based on insufficient probable cause for warrant for defendant's home where "there was nothing to indicate that evidence of the crime was kept at, or

demonstrate only '"a *fair probability* that contraband or evidence of a crime will be found in a particular place.  Zayas-Diaz, 95 F.3d at 111 (quoting Gates, 462 U.S. at 238).

picked up from, the defendant's residence other than the mere
fact that the defendant was suspected of being a criminal"),
discussed in Mem. Supp. Mot. Suppress at [9]-[10].

Accordingly, the court concludes that a reasonably well-
trained officer in Geraghty's position would have believed that
his affidavit established probable cause to search Belton's
residence for drugs and related evidence.  Again, while it may
have been preferable for the police to extract more specifics
from Schofield about the connection between 3 Lilac Lane and
Belton's illicit dealings, the court believes that the affidavit
contains enough information supporting the link to have
reasonably convinced Geraghty that probable cause existed.  The
warrant application, therefore, is not so lacking in indicia of
probable cause as to preclude the government's reliance on the
good faith exception.

Conclusion

For the foregoing reasons, Belton's motions to suppress
(document nos. 14 and 36) are DENIED.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

January 30, 2006
cc:  Paul J. Garrity, Esquire
     Joseph N. Laplante, Esquire
     U.S. Probation
     U.S. Marshal